STROUD, Judge.
 

 *28
 
 Plaintiff filed a complaint alleging that in 2010 defendants published a series of defamatory articles entitled "Agent's Secrets[;]" "[t]he purpose of the Series was to report alleged problems with the SBI[, the State Bureau of Investigation], including the SBI's work, policies, and practices." Plaintiff was a special agent in firearms examination employed by the SBI, and the articles criticized and questioned her work in two murder cases. Plaintiff brought this action claiming defamation and ultimately prevailed before the jury.
 

 Defendants The News and Observer Publishing Company ("N & O") and Mandy Locke
 
 [1]
 
 appeal the order and judgment entered upon the jury verdict determining they had defamed plaintiff and awarding compensatory and punitive damages and a subsequent order denying their motion for judgment notwithstanding the verdict ("JNOV") or in the alternative, motion for a new trial.
 
 [2]
 
 Defendants argue the trial court should have granted their motion for JNOV because plaintiff failed to prove the defamatory statements
 
 *417
 
 were made with actual malice. Defendants also argue the trial court erred by excluding evidence of a report issued after the articles were published which they claim tends to prove the truth of the statements in the articles. Defendants further challenge portions of the jury instructions. We affirm the orders.
 

 I. Amici Curiae Brief
 

 Several news organizations ("Amici") submitted an amici curiae brief to support defendants. Amici emphasize that "[t]his case presents an issue of critical importance to all North Carolina journalists: the proper application of the constitutional 'actual malice' standard to allegedly defamatory speech about a public official." We agree this case presents issues of critical importance not just to journalists but to all citizens and residents of North Carolina and to our court system. Amici are correct that "[t]he operation of the criminal justice system is a matter of
 
 *29
 
 utmost public significance." The United States Supreme Court has long recognized "the 'fundamental value determination of our society,' given voice in Justice Harlan's concurrence in
 
 Winship
 
 , that 'it is far worse to convict an innocent man than to let a guilty man go free.' 397 U.S. at 372 [
 
 90 S.Ct. 1068
 
 .]"
 
 Yates v. Aiken
 
 ,
 
 484 U.S. 211
 
 , 214,
 
 108 S.Ct. 534
 
 , 536,
 
 98 L.Ed.2d 546
 
 , 552 (1988).
 

 Amici contend that if the jury's verdict here stands, it will cause "intolerable self-censorship" prohibited by the First Amendment and "[t]he verdict in this case is particularly dangerous because its crippling size will weigh on the shoulders of all North Carolina news organizations." (Quotation marks omitted.) Amici argue that speech critical of public officials should be almost entirely unrestrained, particularly in areas such as this, of the utmost public concern, to aid in both public safety and justice to the accused. Amici quote Justice Black in his concurrence in the seminal case of
 
 New York Times Co. v. Sullivan
 
 , wherein he and Justice Douglas expressed their belief that regardless of malice, under the Constitution "the Times and the individual defendants had an absolute, unconditional constitutional right to publish in the Times advertisement their criticisms of the Montgomery agencies and officials."
 
 376 U.S. 254
 
 , 293,
 
 84 S.Ct. 710
 
 , 733,
 
 11 L.Ed.2d 686
 
 , 716 (1964) (Black, J., concurring). But the United States Supreme Court has consistently recognized that as important as free debate regarding matters of public interest is, there is a countervailing interest as well-"the individual's right to protection of his own good name":
 

 The need to avoid self-censorship by the news media is, however, not the only societal value at issue. If it were, this Court would have embraced long ago the view that publishers and broadcasters enjoy an unconditional and indefeasible immunity from liability for defamation.
 
 See
 

 New York Times Co. v. Sullivan
 
 ,
 
 supra
 
 , at 293,
 
 84 S.Ct. at 733
 
 (Black, J., concurring);
 
 Garrison v. Louisiana
 
 , 379 U.S. at 80, 85 S.Ct. at 218 (1964) (Douglas, J., concurring);
 
 Curtis Publishing Co. v. Butts
 
 , 388 U.S. at 170, 87 S.Ct. at 1999 (opinion of Black, J.). Such a rule would, indeed, obviate the fear that the prospect of civil liability for injurious falsehood might dissuade a timorous press from the effective exercise of First Amendment freedoms. Yet absolute protection for the communications media requires a total sacrifice of the competing value served by the law of defamation.
 

 The legitimate state interest underlying the law of libel is the compensation of individuals for the harm
 
 *30
 
 inflicted on them by defamatory falsehood. We would not lightly require the State to abandon this purpose, for, as Mr. Justice Stewart has reminded us, the individual's right to the protection of his own good name
 

 "reflects no more than our basic concept of the essential dignity and worth of every human being-a concept at the root of any decent system of ordered liberty. The protection of private personality, like the protection of life itself, is left primarily to the individual States under the Ninth and Tenth Amendments. But this does not mean that the right is entitled to any less recognition by this Court as a basic of our constitutional system."
 
 Rosenblatt v. Baer
 
 ,
 
 383 U.S. 75
 
 , 92,
 
 86 S.Ct. 669
 
 , 679,
 
 15 L.Ed.2d 597
 
 (1966) (concurring opinion).
 

 *418
 

 Gertz v. Welch
 
 ,
 
 418 U.S. 323
 
 , 341,
 
 94 S.Ct. 2997
 
 , 3008,
 
 41 L.Ed.2d 789
 
 , 806 (1974).
 

 Plaintiff is a public official, and the articles published by defendants addressed issues of public concern, so she was required to prove her case to the very highest of standards: she could
 

 recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth. This standard administers an extremely powerful antidote to the inducement to media self-censorship of the common-law rule of strict liability for libel and slander. And it exacts a correspondingly high price from the victims of defamatory falsehood. Plainly many deserving plaintiffs, including some intentionally subjected to injury, will be unable to surmount the barrier of the
 
 New York Times
 
 test.
 

 Id.
 

 at 342
 
 ,
 
 94 S.Ct. at 342
 
 ,
 
 41 L.Ed. 2d at 807
 
 . Despite Amici's contentions otherwise, after a careful examination of the testimony, documentary evidence, and arguments presented by the parties, we conclude that plaintiff's evidence was sufficient to meet the high standard of the
 
 New York Times
 
 test.
 
 See generally
 
 id.
 

 II. Background
 

 This case arises from a defamation suit brought by plaintiff after defendants published articles in The N & O about plaintiff's work as a
 
 *31
 
 special agent for the SBI in examining firearms. As an employee of the SBI, plaintiff was a public official, and she had testified at two murder trials-both arising out of the death of Christopher Foggs-about the bullet fragments and casings found at the scene of the shooting.
 
 See
 

 Desmond v. News & Observer Publ'g Co.
 
 ,
 
 241 N.C. App. 10
 
 , 13-14,
 
 772 S.E.2d 128
 
 , 133 (2015) ("
 
 Desmond I")
 
 . The articles were about plaintiff's work and testimony in the two cases.
 
 Id.
 
 at 14-15,
 
 772 S.E.2d at 133
 
 . We described the factual background of the two underlying criminal trials where plaintiff testified and the articles in the prior appeal in this case:
 

 I. Factual Background
 

 The alleged defamation arose out of defendants' newspaper articles regarding plaintiff's testimony in two criminal trials. Both of the criminal defendants in those cases appealed their convictions to this Court, and we will first review briefly the facts of those underlying cases, as previously described by this Court.
 

 A. Underlying Criminal Cases
 

 In Pitt County, North Carolina, during the afternoon of 19 April 2005, Loretta Strong and several of her female cousins and friends (collectively, the "Haddock girls") were socializing in a vacant lot across the street from the home of Strong's grandmother, Lossie Haddock. Vonzeil Adams drove by the lot with a group of her girlfriends. A verbal altercation arose between the two groups of women. Adams was angry with the Haddock girls because Adams's sister had complained to Adams that the Haddock girls had assaulted the sister in the presence of Adams's children. During the exchange, Adams said she would return and that she had something for the Haddock girls.
 

 Later that afternoon, some of the Haddock girls drove by Adams's house where another verbal altercation occurred. The Haddock girls returned to and congregated on Lossie Haddock's porch.
 

 Around 6:00 p.m. or 7:00 p.m., Adams traveled to Lossie Haddock's house in a reddish Chevrolet Caprice driven by her boyfriend,
 
 *32
 
 Jemaul Green. Adams's sister and several girlfriends were in the car as well. A car full of Adams's girlfriends followed shortly behind. Green parked the car across from Lossie Haddock's house. Adams exited the vehicle and walked toward the house, exchanging words with the women on the porch. The other women exited the vehicle, but stayed behind Adams. Strong stepped off the porch and began to approach Adams, but stopped before she reached the street.
 

 Adams stopped in the middle of the road. She then exclaimed that someone should get a firearm and shoot the Haddock girls. Green exited the vehicle and fired a gun into the air. Green then
 
 *419
 
 pointed the gun in the direction of Lossie Haddock's house and fired several shots. Jasmine Cox, who was on the porch, began running into the house after she saw Green point the gun in the air. She was the first person to get into the house, and testified that, after she got in, she heard more gunfire following the first shots.
 

 Ten-year-old Christopher Foggs, who had been playing in the area, was found face down next to the Haddock house. When he was turned over, a gunshot wound to his chest was discovered. He died from the wound at the hospital later that evening.
 

 State v. Adams
 
 ,
 
 212 N.C. App. 235
 
 ,
 
 713 S.E.2d 251
 
 , slip op. at 2-4,
 
 2011 WL 1938270
 
 (2011) (unpublished). Police never recovered a gun.
 

 On 25 April 2005, a grand jury indicted Green for first-degree murder, among other charges.
 
 State v. Green
 
 ,
 
 187 N.C. App. 510
 
 ,
 
 653 S.E.2d 256
 
 , slip op. at 1 [
 
 2007 WL 4234300
 
 ] (2007) (unpublished),
 
 appeal dismissed and disc. review denied
 
 ,
 
 362 N.C. 240
 
 ,
 
 660 S.E.2d 489
 
 (2008). During the summer 2006 trial, plaintiff, a North Carolina State Bureau of Investigation ("SBI") forensic firearms examiner, opined to a scientific certainty that eight cartridge cases, which were found at the site of the shooting, were all fired from the same gun, a High Point 9 millimeter semiautomatic pistol. Plaintiff further opined that two bullets, which
 
 *33
 
 were found at the site of shooting, were fired from the same type of gun, a High Point 9 millimeter semiautomatic pistol, but that she could not conclusively determine whether the bullets were fired from the same gun. On voir dire, plaintiff testified she was absolutely certain as to her findings. In a lab report, plaintiff stated that the two bullets "exhibit class characteristics that are consistent with ammunition components that are fired by firearms that are manufactured by or known as: Hi-point (Model C)."
 

 At trial, Green testified that, during the confrontation, a person shot a gun at him. He testified that he shot back at the person but that the person ran away. On 2 August 2006, a jury found Green guilty of second-degree murder, among other offenses.
 

 A grand jury also indicted Adams for first-degree murder, among other charges. During the spring 2010 trial, plaintiff gave the same opinion about the cartridge cases and bullets. A jury found Adams guilty of voluntary manslaughter, under an aiding-and-abetting theory, among other offenses.
 

 During Adams's trial, her lawyer, David Sutton, arranged for Frederick Whitehurst, who had previously worked as a forensic chemist in a Federal Bureau of Investigation ("FBI") crime laboratory, to take photographs of the two bullets butt-to-butt with his microscope.
 

 B. Newspaper Articles
 

 In March 2010, Locke, an investigative reporter for N & O, became interested in the
 
 Green
 
 and
 
 Adams
 
 cases. Locke interviewed plaintiff; Sutton; Whitehurst; Liam Hendrikse, a firearms forensic scientist; Stephen Bunch, a firearms forensic scientist and former FBI scientist; William Tobin, a forensic material scientist and metallurgist; Adina Schwartz, a professor at the John Jay College of Criminal Justice; Clark Everett, the Pitt County district attorney during the
 
 Green
 
 and
 
 Adams
 
 cases; and Jerry Richardson, the SBI laboratory director.
 

 On 14 August 2010, N & O published an article written by Locke and Joseph Neff, which was entitled, "SBI relies on bullet analysis critics deride as unreliable." In the 14 August article, Locke and Neff are highly critical of plaintiff's bullet analysis and testimony in the
 
 Green
 

 *34
 
 and
 
 Adams
 
 cases and include one of Whitehurst's photographs of the two bullets. In September or October 2010, Everett engaged Bunch to conduct an outside examination of the eight cartridge cases and two bullets. Bunch agreed with plaintiff that the eight cartridge cases were fired from the same firearm. Bunch also concluded that it is likely, but not certain, that the two bullets were fired from the same type of gun, a High Point 9 millimeter semi-automatic pistol. Bunch further concluded that the two bullets could have been fired from the
 
 *420
 
 same gun. On 31 December 2010, N & O published a follow-up article, written by Locke and Neff, which was entitled "Report backs SBI ballistics." In the 31 December article, Locke and Neff discussed Bunch's results but emphasized that, unlike plaintiff, Bunch refused to ascribe absolute certainty to his finding that the two bullets were likely fired from the same type of gun.
 

 II. Procedural Background
 

 On 1 September 2011, plaintiff brought libel claims against N & O, McClatchy, N & O's parent company, Locke, Neff, John Drescher, N & O's executive editor, and Steve Riley, N & O's senior editor of investigations, among other defendants who were later dismissed from this action. On 27 June 2013, plaintiff filed her first amended complaint. On or about 22 January 2014, plaintiff moved to amend her first amended complaint. On 27 January 2014, N & O, McClatchy, Locke, Neff, Drescher, and Riley moved for summary judgment. On or about 5 March 2014, the trial court allowed plaintiff's motion, and plaintiff filed her second amended complaint. On 14 March 2014, the trial court granted Neff, Drescher, and Riley's motion for summary judgment but denied N & O, McClatchy, and Locke's motion for summary judgment. On 4 April 2014, defendants gave timely notice of appeal.
 

 Id.
 
 at 12-15,
 
 772 S.E.2d at 132-34
 
 (citations, quotation marks, ellipses, and brackets omitted).
 

 In
 
 Desmond I
 
 , defendants argued "that the trial court erred by denying their motion for summary judgment as to plaintiff's libel claims."
 
 Id.
 
 at 16,
 
 772 S.E.2d at 134
 
 . This Court then analyzed each of the sixteen statements plaintiff alleged as defamatory from the defendants' articles
 
 *35
 
 and ultimately determined the trial court had properly granted summary judgment as to ten of the statements and should have denied the summary judgment motion as to six of the statements; we remanded to the trial court for the case to proceed with plaintiff's claims based upon those six statements.
 
 See
 

 id.
 
 at 18-31,
 
 772 S.E.2d at 135-43
 
 .
 

 The jury trial began on 26 September 2016. Plaintiff called over a dozen witnesses and presented over 100 exhibits; defendants called two witnesses, one of whom was defendant Locke, and presented fewer than 20 exhibits. On 17 October 2016 the trial court instructed the jury, and on 18 October 2016 the jury reached a verdict. The verdict form included a separate determination for each of the six statements. The six statements were:
 

 1. "Independent firearms experts who have studied the photographs question whether Desmond knows anything about the discipline. Worse, some suspect she falsified the evidence to offer prosecutors the answers they wanted."
 

 2. " 'This is a big red flag for the whole unit,' said William Tobin, former chief metallurgist for the FBI who has testified about potential problems in firearms analysis. 'This is as bad as it can be. It raises the question of whether she did an analysis at all.' "
 

 3. "The independent analysts say the widths of the lands and the grooves on the two bullets are starkly different, which would make it impossible to have the same number."
 

 4. " 'You don't even need to measure to see this doesn't add up,' said Hendrikse, the firearms analyst from Toronto. 'It's so basic to our work. The only benefit I can extend is that she accidentally measured the same bullet twice.' "
 

 5. "Other firearms analysts say that even with the poor photo lighting and deformed bullets, it's obvious that the width of the lands and grooves are different."
 

 6. "Ballistics experts who viewed the photographs, including a second FBI scientist who wrote the report released Thursday, said the bullets could not have been fired from the same firearm."
 

 The first five statements are from articles written by defendant Locke and plaintiff's claims are against both defendants; the sixth statement is from an article written by Joseph Neff, defendants' other witness, and plaintiff's claim is only against defendant N & O.
 

 *421
 
 The jury found each of the six statements to be materially false and found for each statement "by strong, clear and convincing evidence that
 
 *36
 
 at the time of publication, defendant Mandy Locke either knew [the statement] was materially false or had serious doubts as to whether [the statement] was true." The jury awarded plaintiff $1.5 million in "presumed damages" from both defendants based upon Statements 1 through 5; $11,500 in "actual damages" from defendant N & O only as to statement 6; $75,000 in "punitive damages" from defendant Locke; and $7.5 million in punitive damages from defendant N & O.
 
 [3]
 

 Defendants moved for JNOV or, in the alternative, for a new trial. On 30 January 2017, the trial court entered an amended order denying the motion. Defendants appeal the order and judgment entered upon the jury verdict and the order denying their motion for JNOV.
 

 III. Actual Malice
 

 Defendants first contend that plaintiff "failed to prove constitutional actual malice[,]" (original in all caps), and "this Court should direct the entry of judgment in favor of The Newspaper Defendants notwithstanding the verdict."
 

 A. Standard of Review
 

 The standard of review of the denial of a motion for a directed verdict and of the denial of a motion for JNOV are identical. We must determine whether, upon examination of all the evidence in the light most favorable to the non-moving party, and that party being given the benefit of every reasonable inference drawn therefrom and resolving all conflicts of any evidence in favor of the non-movant, the evidence is sufficient to be submitted to the jury.
 

 Springs v. City of Charlotte
 
 ,
 
 209 N.C. App. 271
 
 , 274-75,
 
 704 S.E.2d 319
 
 , 322-23 (2011) (citation and quotation marks omitted).
 

 As explained in
 
 Desmond I
 
 ,
 

 In order to recover for defamation, a plaintiff generally must show that the defendant caused injury to the plaintiff by making false, defamatory statements of or concerning the plaintiff, which were published to a third person. This statement must be a statement of fact, not opinion, but "an individual cannot preface an otherwise defamatory
 
 *37
 
 statement with 'in my opinion' and claim immunity from liability."
 

 Whether a statement constitutes fact or opinion is a question of law for the trial court to decide. Like all questions of law, it is subject to de novo review on appeal. In determining whether a statement can be reasonably interpreted as stating actual facts about an individual, courts look to the circumstances in which the statement is made. Specifically, we consider whether the language used is loose, figurative, or hyperbolic language, as well as the general tenor of the article.
 

 The court must view the words within their full context.
 

 Moreover,
 

 where the plaintiff is a public official and the allegedly defamatory statement concerns his official conduct, he must prove that the statement was made with actual malice-
 
 that is, with knowledge that it was false or with reckless disregard of whether it was false or not
 
 . The rule requiring public officials to prove actual malice is based on First Amendment principles and reflects the Court's consideration of our national commitment to robust and wide-open debate of public issues.
 

 ....
 

 It is important to acknowledge that evidence of personal hostility does not constitute evidence of actual malice. Additionally, reckless disregard is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.
 

 *422
 
 Plaintiff stipulates that she is a public official.
 

 Desmond I
 
 ,
 
 241 N.C. App. at 16-17
 
 ,
 
 772 S.E.2d at 135
 
 (emphasis added) (citations, quotation marks, ellipses, and brackets omitted).
 

 *38
 
 In addition,
 

 [t]he question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law. This rule is not simply premised on common-law tradition, but on the unique character of the interest protected by the actual malice standard. Our profound national commitment to the free exchange of ideas, as enshrined in the First Amendment, demands that the law of libel carve out an area of breathing space so that protected speech is not discouraged. The meaning of terms such as "actual malice"-and, more particularly, "reckless disregard"-however, is not readily captured in one infallible definition. Rather, only through the course of case-by-case adjudication can we give content to these otherwise elusive constitutional standards. Moreover, such elucidation is particularly important in the area of free speech for precisely the same reason that the actual malice standard is itself necessary. Uncertainty as to the scope of the constitutional protection can only dissuade protected speech-the more elusive the standard, the less protection it affords. Most fundamentally, the rule is premised on the recognition that judges, as expositors of the Constitution, have a duty to independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.'
 

 There is little doubt that public discussion of the qualifications of a candidate for elective office presents what is probably the strongest possible case for application of the New York Times rule, and the strongest possible case for independent review. As Madison observed in 1800, just nine years after ratification of the First Amendment:
 

 Let it be recollected, lastly, that the right of electing the members of the government constitutes more particularly the essence of a free and responsible government. The value and efficacy of this right depends on the knowledge of the comparative merits and demerits of the candidates for public trust, and on the equal freedom, consequently, of examining and discussing these merits and demerits of the candidates respectively.
 

 *39
 
 This value must be protected with special vigilance. When a candidate enters the political arena, he or she must expect that the debate will sometimes be rough and personal, and cannot "cry Foul!" when an opponent or an industrious reporter attempts to demonstrate that he or she lacks the sterling integrity trumpeted in campaign literature and speeches. Vigorous reportage of political campaigns is necessary for the optimal functioning of democratic institutions and central to our history of individual liberty.
 

 We have not gone so far, however, as to accord the press absolute immunity in its coverage of public figures or elections. If a false and defamatory statement is published with knowledge of falsity or a reckless disregard for the truth, the public figure may prevail. A "reckless disregard" for the truth, however, requires more than a departure from reasonably prudent conduct. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. The standard is a subjective one-there must be sufficient evidence to permit the conclusion that the defendant actually had a high degree of awareness of probable falsity. As a result, failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard. In a case such as this involving the reporting of a third party's allegations, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.
 

 In determining whether the constitutional standard has been satisfied, the reviewing court must consider the factual record
 
 *423
 
 in full. Although credibility determinations are reviewed under the clearly-erroneous standard because the trier of fact has had the opportunity to observe the demeanor of the witnesses, the reviewing court must examine for itself the statements in issue and the circumstances under which they were made to see whether they are of a character which the principles of the First Amendment protect.
 

 Harte-Hanks Communications, Inc. v. Connaughton
 
 ,
 
 491 U.S. 657
 
 , 685-89,
 
 109 S.Ct. 2678
 
 , 2694-96,
 
 105 L.Ed.2d 562
 
 , 587-89 (1989) (citations, quotation marks, and brackets omitted).
 

 *40
 
 B. Analysis
 

 The question before this Court is "whether, upon examination of all the evidence in the light most favorable to ... [plaintiff], and ... [plaintiff] being given the benefit of every reasonable inference drawn therefrom and resolving all conflicts of any evidence in favor of ... [plaintiff],"
 
 Springs
 
 ,
 
 209 N.C. App. at 274-75
 
 ,
 
 704 S.E.2d at 323
 
 , there was "clear and convincing proof of 'actual malice[;]' "
 
 Harte-Hanks
 
 ,
 
 491 U.S. at 686
 
 ,
 
 109 S.Ct. at 2695
 
 ,
 
 105 L.Ed.2d at 588
 
 ,
 
 i.e.
 
 , evidence that defendants published the statements at issue "with knowledge that [they were] false or with reckless disregard of whether [they were] false or not."
 
 Desmond I
 
 ,
 
 241 N.C. App. at 17
 
 ,
 
 772 S.E.2d at 135
 
 .
 

 Plaintiff presented many days of testimony and evidence regarding defendant Locke's investigation, her interviews with various people, drafting of the articles, and communications between defendant Locke and other employees of defendant N & O. Defendant N & O directs our attention to the testimony of defendant Locke, the reporter who wrote most of the statements at issue. Defendants contend that because defendant "Locke testified, without contradiction, that she believed the first Five Statements to be substantially true when she wrote them" "[t]he record evidence fell well short of establishing, with the requisite convincing clarity, that The Newspaper Defendants published the Six Statements with actual knowledge that they were materially false or despite having entertained serious doubts about their truth." But the jury determines the credibility and weight of the evidence, and the jury is not required to accept the testimony of any witness.
 
 See
 

 Penley v. Penley
 
 ,
 
 314 N.C. 1
 
 , 18,
 
 332 S.E.2d 51
 
 , 61 (1985) ("The resolution of conflicts in the evidence, the credibility of witnesses, and the weight to be given any evidence is for the jury."). The jury is not required to accept testimony of the author of the statements that she actually believed the statements to be substantially true.
 
 See generally
 
 id.
 

 The United States Supreme Court has determined that a defamation defendant cannot "automatically insure a favorable verdict by testifying" that she believed the statements to be true:
 

 The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is
 
 *41
 
 based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.
 

 St. Amant v. Thompson
 
 ,
 
 390 U.S. 727
 
 , 732,
 
 88 S.Ct. 1323
 
 ,
 
 20 L.Ed.2d 262
 
 , 267-68 (1968).
 

 Defendant relies heavily on the Fourth Circuit case of
 
 Ryan v. Brooks
 
 , where the Court noted, "In two cases in which the evidence of malice was found to be sufficient, by contrast, the facts indicated strongly that the challenged allegations had been completely fabricated by the writer."
 
 634 F.2d 726
 
 , 734 (4th Cir. 1980). Ultimately the Court in
 
 Ryan
 
 concluded there was not sufficient evidence of actual malice:
 

 [W]e think the evidence in this case was insufficient to bring John Brooks' actions within those outer limits of reckless conduct
 
 *424
 
 marked out in Supreme Court cases. Assuming that the use of the words "extortion" and "false vouchers" rendered the sentence false and defamatory, there is clearly no evidence that Brooks knew they were false. The only question is whether he actually doubted their accuracy but left them unchanged, without further investigation. There is nothing in the record to indicate that Brooks had any such doubts. He relied on two secondary sources which he had used in the past and which have an excellent reputation. He had no reason to doubt the accuracy of their accounts of Ryan's
 
 Observer
 
 interview. The reliability of the third source, the internal Management Report of AT & T, is more questionable, but Brooks used nothing from it that was not also found in his other sources. It simply served to corroborate the existence of the false vouchering system reported in
 
 Business Week
 
 . Even if the three sources together should have tipped Brooks to the existence of a dispute between Ryan and Southern Bell executives, as Ryan argues they must have, he would still have no reason to suspect that the
 
 Times
 
 and
 
 Business Week
 
 had not reported Ryan's statements accurately.
 

 Clearly it would have been better journalistic practice to have verified the accuracy of these secondary sources by reading the original account in the
 
 Charlotte Observer
 
 . But we cannot say that the failure to do so amounted to
 
 *42
 
 more than mere negligence. We recognize that the book was not "hot news," and a more thorough investigation should be expected in these circumstances than in the preparation of a news story under deadline pressure. Nevertheless, the sentence was such a small part of the whole work that the author might understandably feel three sources to be sufficient. Certainly where there was no reason to doubt the accuracy of the sources used, the failure to investigate further, even if time was available, cannot amount to reckless conduct.
 

 Nor can the fact that Brooks changed the words of his sources create a jury issue on the question of malice. The historian's job is not to copy statements exactly as written in a secondary source, but to interpret and rework them into the whole. Though "extorted" was an unfortunate choice of words because of its criminal connotations, it does also mean simply "obtained by force." Since Ryan's testimony indicated that the contributions to the fund were not entirely voluntary, the word was not really off the mark. In
 
 Time, Inc. v. Pape
 
 ,
 
 401 U.S. 279
 
 ,
 
 91 S.Ct. 633
 
 ,
 
 28 L.Ed.2d 45
 
 (1971), the Court considered a defamation claim arising from a magazine writer's omission of the word "alleged" when citing a report of a certain incident of police brutality. The Court reasoned that omission of the word was perhaps due to a misconception, but was nevertheless an interpretation drawn from the report as a whole; to permit the malice issue to go to the jury because of it would be to impose a much stricter standard of liability on errors of interpretation or judgment than on errors of historic fact. We think this reasoning applies here, and would not find proof of malice in Brooks' use of slightly stronger language than his source's.
 

 Id.
 
 at 732-33 (citations and quotation marks omitted).
 

 Ryan
 
 addressed actual malice based upon the plaintiff's claim that the defendant fabricated the story, but the evidence showed that the reporter had relied upon sources with excellent reputations whom he had used in the past.
 
 See id.
 
 There was no evidence that the reporter had any doubts or reason to believe the information was inaccurate.
 
 See id.
 
 Even if he could have conducted a more thorough investigation, under the circumstances, his failure to do so was not reckless.
 
 See id.
 
 But here, plaintiff presented evidence that defendants, on multiple
 
 *43
 
 occasions, took the statements of some sources out of context, and thus ultimately published articles that were not in line with what the sources actually said.
 

 Again, there is no single definition of "actual malice" in defamation cases since defamation cases depend heavily on the unique facts of each case: "only through the course of case-by-case adjudication can we give content to these otherwise elusive constitutional standards."
 
 Harte-Hanks
 
 ,
 
 491 U.S. at 686
 
 ,
 
 109 S.Ct. 2678
 
 ,
 
 105 L.Ed.2d at 587-88
 
 . We
 
 *425
 
 thus turn to the evidence and plaintiff's theory of the case. Plaintiff contended that defendants decided in advance what the story would be, and when defendant Locke's investigation failed to support the story as planned, they intentionally proceeded with the story anyway. Defendants knew that an independent examination of the bullets was pending but published the article on the planned schedule without waiting for the results. Although
 
 all
 
 of the experts defendant Locke consulted told her they could not give any opinion based only on pictures, and some told her they were not even qualified to give an opinion on plaintiff's work, still defendants attributed the six statements criticizing plaintiff's work to these experts. And the results of Stephan Bunch's independent examination of the bullets ultimately supported plaintiff's examination. Consistent with our obligation to independently review the evidence to determine if there was "clear and convincing proof of 'actual malice[;]' "
 

 id.
 

 at 686
 
 ,
 
 105 L.Ed.2d at 588
 
 ,
 
 i.e.
 
 , evidence that defendants published the statements at issue "with knowledge that [they were] false or with reckless disregard of whether [they were] false or not[,]"
 
 Desmond I
 
 ,
 
 241 N.C. App. at 17
 
 ,
 
 772 S.E.2d at 135
 
 , we will briefly summarize a small part of the extensive evidence supporting plaintiff's claim.
 

 During the time defendant N & O was developing the "Agent's Secret" series which would "[show] how practices by the State Bureau of Investigation have led to wrongful convictions[,]" (quotation marks omitted), defendant Locke had learned about attorney David Sutton's "concerns about the firearms performance of Agent Desmond[.]" Sutton represented the defendant, Vonzeil Adams, in her murder trial. At Sutton's request, Fred Whitehurst, a former FBI chemist, looked at two bullet fragments from the scene of the crime under a microscope and photographed them. Sutton filed a motion for mistrial based upon Whitehurst's photographs.
 

 Sutton alleged in his motion that the photographs "clearly show that the 'lands and grooves' in Q-9 and Q-10[, the two bullet fragments,] are distinctly dissimilar" and that the photographs "were sent to William Tobin, formerly of the FBI laboratory for analysis." Sutton went on to
 
 *44
 
 state that Tobin "says 'preliminary' based upon a photograph sent by Whitehurst there is ample reason to question whether the class characteristics in Q-9 and Q-10 are the same." Sutton alleged "[u]pon information and belief" that "Q-10 does not have even the five lands and grooves [plaintiff] testified were present." Sutton requested a mistrial based upon "denial of exculpatory evidence pursuant to
 
 United States v. Brady
 
 and what appears to be factually incorrect testimony as well." The motion for mistrial was denied.
 

 Defendant Locke discussed the case with Sutton and began to put the story together, and in her first draft she used a quote from Sutton: "[Plaintiff] just made it up. She made it up because she could, and prosecutors needed her to. It's that simple." Plaintiff's theory was that defendant Locke had decided at this point "That's what she wanted the story to be[;]" but what she wanted the story to be was simply a contention from a defense attorney-not an impartial source and not an expert. And this accusation-that plaintiff "just made it up"-was perhaps the worst accusation possible against any witness, but particularly an agent of the SBI laboratory whose credibility is paramount when testifying regarding evidence in a murder trial. The accusation was that plaintiff fabricated the evidence in her report, perjured herself in her testimony in a murder trial, and intentionally or recklessly contributed to a possible wrongful conviction of an innocent person, with the logical corollary that the actual murderer would remain free to commit more crimes. But to produce the article defendant Locke needed experts in firearm analysis to substantiate Sutton's claim that plaintiff "just made it up." Thus, defendant Locke contacted various experts seeking opinions on plaintiff's work in the Adams case.
 

 As part of defendant Locke's investigation she contacted Tobin, the expert from Sutton's motion for mistrial; Tobin was a "former chief metallurgist for the FBI." Statement 2 was attributed to Tobin. Plaintiff presented evidence that Locke misrepresented information regarding the bullet fragments to Tobin to elicit statements critical of
 
 *426
 
 her work for the article and to bring into question whether the class characteristics in the two bullet fragments were the same, but merely raising a question was not what defendants Locke and N & O wanted for the series, they wanted wrongdoing by the SBI which led to a wrongful conviction.
 

 After discussions and a series of emails about the case with defendant Locke, Tobin clarified
 
 in writing
 
 the limitations of his comments to defendant Locke. On 3 August 2010, prior to publication of the first article on 8 August 2010, Tobin sent an email to defendant Locke stating, in part:
 

 *45
 

 I don't do F/TM examinations, and most particularly don't render opinions from photographs in an area in which I don't function
 
 . I only testify as a scientist objecting to the lack of a scientific foundation for testimonies of individualization (specific source attribution), and report on the opinion of my [rather distinguished] colleagues who also strenuously disagree with the conclusions rendered by F/TM examiners. The science doesn't support such conclusions.
 

 I never testify [ (sic) ] to the possible fact of a match, only as to the lack of scientific (and statistical) foundation for inferences of individualization.
 

 (Emphasis added.) Despite Tobin's specific notification he did not "render opinions from photographs in an area in which I don't function," defendants published the article including statements attributed to Tobin. Instead of presenting Tobin's opinions on the validity of individualization in general, the article represented that Tobin had specifically analyzed plaintiff's work. Statements 1 and 2 directly criticize plaintiff's work in the Adams case, even suggesting complete incompetence ("experts who have studied the photographs question whether Desmond knows anything about the discipline") or intentional falsification of evidence ("some suspect she falsified the evidence to offer prosecutors the answers they wanted.").
 

 Plaintiff's attorney accurately summarized the evidence regarding Tobin to the jury,
 

 With regards to Tobin, you know, they rely a lot on Bill Tobin, but you recall his testimony that he may have said this is bad as it can be. He may have said-he may have used those words, and those words appear in her notes, Mandy Locke's notes. Okay? He may have said it raises a question about whether she did an analysis at all. But he made it very clear that anything he would have said with regards to that was in response to Locke asking him how mistakes generally are made, or asking him to hypothetically assume that an independent analysis in fact determined Desmond was wrong.
 

 He did not tell her that he questioned whether or not Desmond had done analysis-analysis at all. And when asked if he ever stated to Locke that he questioned whether Desmond knew anything about the discipline,
 
 *46
 
 you recall his testimony. "First of all, I continued to advise Locke that I have no basis to make any claims of this particular examiner's work, I have none. I have no. I didn't know who she or he was. I had no experience with the work product, so I have no basis to make any statements regarding a specific examiner's proficiency. It's not even a field of which I normally will deal anyway. This is such a foreign statement. I would not be in a basis to claim that somebody doesn't know anything about an area in which I don't even deal, in which I don't even perform, that I don't even operate. It's like we're on two different planets as far as how that conversation went."
 

 On 17 August 2010, Tobin contacted Jerry Richardson, SBI Assistant Director
 
 [4]
 
 "to apologize[.]" Richardson described Tobin's comments in an email:
 

 Bill Tobin, FBI Chief Metallurgist, who is quoted from Saturday's article contacted me earlier today, He wanted to apologize to Beth Desmond, the SBI Firearms Section and me for the manner in which his comments were portrayed in Firearms article. He advises that he only answered questions from the reporter in general terms and actually was not aware of the circumstances of any of the cases and has
 
 *427
 
 no knowledge of Desmond's work. Tobin advises that his quotes are from three different questions and appears to have been combined from a series of "What ifs." He further wanted us to know that he is
 

 not
 

 one of the independent experts that is mentioned in the article.
 

 (Emphasis in original.)
 

 Plaintiff presented evidence of many emails and conversations between Tobin and defendant Locke, and Tobin testified in his deposition about the specific statements attributed to him:
 

 Q. If I understand your answer correctly, your comment, This is as bad as it can be, or It doesn't get any worse than this, was assuming that it was determined that a mistake or an error had been made; is that fair to say?
 

 A. Yes, I would also remind, should remind somebody, that that was out of context. In context I was also implying
 
 *47
 
 that what I just said is true with regard to the practice of firearms identification, but one needs to put that also in a systemic context because what I believe we had already discussed, if in fact an error had been made, how it crept through the system through what should have been some systemic peer reviews, supervisory reviews of the crime lab, itself, as well.
 

 So in other words, even if an error existed, it should have been detected somewhere along the normal system of reviews before it's admitted or before it's released from the agency. So that was in the context in which I said it doesn't get any worse than that, if in fact an error was made. Again, that's the subjunctive, the caveat or disclaimer, then, comma, then this is it doesn't get any worse than the easiest of the three types of an error creeping all the way through the system. That what I was meaning by it doesn't get any worse than this.
 

 Again
 
 ,
 
 I was not referring to a specific examiner or a specific case.
 
 I was just discussing general errors as Type 1, Type 2, and Type 3 errors and the presumed system of checks and balances and error quality control process that should exist in the system. Does that make any sense?
 

 Q. It does. So is it fair to say that your comment of either, This is as bad as it could be or It doesn't get any worse than this, that you may have made to Mandy Locke was not referring to Beth Desmond's work in this case?
 

 A. Correct.
 

 Q. In any of your conversations with Ms. Locke, did you state to Ms. Locke that you questioned whether Beth Desmond knew anything at all about the discipline of firearms examination?
 

 A. First of all,
 
 I continue to advise Fred and Mandy that I have no basis to make any claims of this particular examiner's work. I have none. I have no, I didn't know who she or he was. I had no experience with her work product, so I have no basis to make any statements regarding a specific examiner's proficiency
 
 .
 

 It's not even a field in which I normally will deal anyway. So on numerous levels I had no basis to make
 

 *48
 

 any claim about someone's proficiency. So I don't recall making any statement that she doesn't know anything about firearms or whatever you, firearms identification. I don't recall making that statement.
 

 If I did, it would have been included in the universe or the entire same pool, it's known as, entire possible events leading up to an error if on occurred, if one had occurred, but I don't recall making that statement.
 

 Q. So is it fair to summarize your answer by saying you don't recall making any statement like that, but if you had made a statement like that, the only way you could have possibly made a statement like that is if in response to the assumption that a mistake had, in fact, been made and you were laying that out as one possibility along with a lot of other possibilities as the cause of the mistake.
 

 A.
 
 Yes, but that is such a foreign statement. I would not be in a basis to claim that somebody doesn't know anything about an area in which I don't even deal, in which I don't even perform, that I don't even operate.
 

 *428
 
 So again, I continually admonish-well, not
 
 , I continually reminded Fred and Mandy that I can only present generic assessments of errors
 
 , what types of errors and systematic issues from my experiences, both as a scientists and also as a[ ] forensic examiner inside, behind the blue wall. I can only address these areas generically.
 

 So I would not have any basis at all to make any statement about someone's proficiency in an area outside of metallurgy material science and possibly legally, in the legal community.
 
 But I would not make such a statement. That's not, I have no basis to make that statement
 
 .
 

 Q. In any of your conversations with Ms. Locke, did you ever tell Ms. Locke that you suspected that Beth Desmond falsified evidence to offer prosecutors the answer they wanted?
 

 A.
 
 No. Again, I have no basis. There is not, that is so inconsistent on numerous levels for me to make that statement, so I did not make that statement.
 

 Q. In any of your conversations with Ms. Locke did you ever tell Ms. Locke that you questioned whether Beth Desmond had done an analysis at all?
 

 *49
 
 A. I'll say if you take out the two words Beth and Desmond, yes. I do recall including that in the-that's called drylabbing-take the name out and I concluded that, included that in the possible universe of explanations as to what could have occurred if an error had, in fact, been made.
 

 But I did not specifically indicate that Beth Desmond committed an error. Again, over and over I told anyone with whom I was interacting, I have no basis to judge her work product or her proficiency.
 

 (Emphasis added.)
 

 After Tobin's initial response that he could not give an opinion on plaintiff's work, defendant Locke began seeking another expert who could support Sutton's claim of fabrication of evidence. Adina Schwartz, "a professor at the John Jay College of Criminal Justice[,]"
 
 Desmond I
 
 ,
 
 241 N.C. App. at 14
 
 ,
 
 772 S.E.2d at 133
 
 , was in contact with many involved with the questions regarding the bullets and at one point she sent an email to numerous parties stating,
 

 Dear All,
 

 I apologize for any misleading impressions I created by the e-mail I sent yesterday. First, the State has NOT conceded that any error was committed. Second, a definitive statement that the bullets came from two guns can't be made on the basis of Fred's photographs or, indeed, any photos. To reach a definite conclusion as to the class characteristics on the two bullets, the bullets themselves will need to be examined.
 

 Plaintiff also summarized the evidence regarding Schwartz to the jury,
 

 "Question, would you have ever told Mandy Locke that you suspected that Beth Desmond had falsified her reports?"
 

 "Answer, no. That is not something I would have said, chiefly because I don't have access to Ms. Desmond's mind. To say 'falsified' would have been that she did something, deliberately lied. How could I know without having access to her mind."
 

 Later on, "Question, did you ever-would you have ever told Mandy Locke that the widths of the lands and grooves impressions on the bullets that Beth Desmond
 
 *50
 
 examined were starkly different, and therefore it's impossible for the bullets to have the same number of land and groove impressions?"
 

 "Answer, I could only have said, I might have said that Liam had that opinion, or that Fred had that opinion, or possibly if Bill Tobin had got involved, that they had that opinion. I'm not competent to have such an opinion. I wasn't then, and I am not now, I have never been competent to have such an opinion."
 

 Liam, from the email, refers to Liam Hendrikse. Hendrikse is "a firearms forensic scientist[.]"
 

 Id.
 

 As summarized by plaintiff's attorney to the jury,
 

 Here you have Hendrikse to Locke, "The fact remains that unless I physically examine them, I won't know if NCSBI are correct or not." Where was that in the article? "Did they ever employ an independent examiner to get a second opinion?"
 

 *429
 
 That was an e-mail. So obviously Hendrikse at this point is saying, you know, what's the status with the second-with the second exam. And almost like, why are you still contacting me?
 

 And the e-mail from Locke to Hendrikse. This is an interesting one. This is the one that-that-that was obtained from Liam Hendrikse, and the News and Observer never had a copy, didn't provide us a copy. "Thanks for that"-"Liam, thanks for that. That's what I suspected." And this was in response to Liam Hendrikse asking her have they hired somebody else.
 

 "They hired a guy and run through a million hoops to physically get the bullets sent. The DA has dragged his feet per pressure from the SBI. They are avoiding scrutiny."
 

 But defendant Locke failed to mention to Hendrikse that a second examination of the bullets was going to be conducted, but it would not be complete before the planned date for the series to run.
 

 Statement 4 was specifically attributed to Hendrikse, and he asked defendant Locke in an email for a retraction because his statements were misrepresented in the series:
 

 Hope all is well down in NC. Just had a quick question after speaking with several professional colleagues. I've been having trouble with the context of the quotes that are attributed to me and I was wondering if a retraction was possible.
 

 *51
 
 The two quotes that I have real issues with are the following:
 

 1. "The chances of a gun not matching a bullet recovered from the crime scene when it involves an American gun is highly likely. Our days of speaking with such certainly should be over."
 

 The first part of that was misinterpreted.
 
 We were speaking on the phone about Class Characteristics, not Individual Characteristics. We spoke about how Agent Desmond arrived at determining that the bullet was fired from a Hi-Point. I mentioned that it is usually very difficult to narrow down the possible makes of gun, to just one when analyzing the Class Characteristics of a bullet.
 
 The quote makes it seem like I'm saying it's unlikely that you can link a bullet to the individual gun that fired it. This is wrong, and in a nutshell makes me appear to be a lunatic. The existence of such a quote have longer-term ramifications with respect to my career and credentials.
 

 The latter part of that quote doesn't really say anything without that first part.
 

 2. The only benefit I can extend is that she accidentally measured the same bullet twice.
 

 I feel that this is unfair to both agent Desmond and to myself. Both verbally, and in writing, I stated that I couldn't tell you if she was right or wrong unless I examined the items.
 

 (Emphasis added.)
 

 Among other experts defendant Locke consulted was Steven Bunch, "a firearms forensic scientist and former SBI scientist[,]"
 

 id.
 
 ;
 
 defendant Locke testified Bunch was a source for Statement 1, along with Tobin and Hendrikse. Plaintiff's counsel accurately summarized his testimony to the jury:
 

 He testified that he conditioned any comments made on the Whitehurst photographs actually depicting the-the rifling-he conditioned any comments he made regarding the photographs on the photographs actually accurately depicting the-the characteristics on the bullets themselves. And he never passed judgment on Desmond's work.
 

 *52
 
 Plaintiff further contended that when the SBI became aware of the questions regarding the bullets, Richardson sent Whitehurst an email regarding the photographs, noting they were not accurate:
 

 So this is the e-mail from Richardson, Jerry Richardson, head of the crime lab to Fred Whitehurst. And you'll see down at the bottom here he's talking about the issues. "We have noted a number of issues associated with the photos. These issues include photographs [sic] not properly oriented, improper side lighting, unknown microscope magnification, focus, and the use of what appears to be tweezers or other metal objects to handle the evidence during photography which could alter the evidence."
 

 *430
 
 Well, what does-what does Mandy Locke say? In the e-mail she turns that around and says that to her sources, "The photographer had the fragments propped up on metal tweezers but said he didn't handle the bullets with them. The SBI leadership is saying that the metal-to-metal contact likely corrupted the evidence."
 

 Plaintiff contended that instead of informing the experts she was aware of the potential deficiencies of the photographs, defendant Locke sought to use the information to support her theory that the SBI was trying to hide the truth. Plaintiff presented evidence of a series of emails between defendant Locke and the experts at the end of July. In one email to Bunch, defendant Locke stated, "And not surprisingly, instead of addressing a grave mistake, the SBI leadership is trying to discredit the photos you and others saw of those bullet fragments[.]" But
 
 no one
 
 had ever determined that any "grave mistake" had happened.
 

 Finally, just before publication of the series, defendant Locke met with plaintiff. The recorded conversation between the two was a trial exhibit. Plaintiff explained her analysis and how she came to her conclusions. Plaintiff explained why the pictures did not accurately show grooves on the bullets and noted that the markings she relied upon were not even visible in the pictures. At the end of the interview, plaintiff asked defendant Locke if she understood and if she had clarified everything; Locke said that she had.
 

 After meeting with plaintiff, defendant Locke emailed Hendrikse stating, "I'm trying to find a way to believe her. Her confidence was really surprising. She said she has no interest in doing the analysis again because her work was so good she didn't make errors." But the recorded exchange shows that, although she was confident of her work, plaintiff actually wanted another examination of the bullets:
 

 *53
 
 MS. LOCKE: Beth the[y]'re going to send these bullets off ... what if you're wrong?
 

 MS. DESMOND: This is what we've been asking them to do. Mr. Whitehurst has, about a month and a half, maybe two months ago, called and asked if we wanted them back, if we wanted to reexamine them. And we said no because we're confident in our work.
 

 I know that I did my job and I testified as to my findings regarding that.
 
 Of course, we would like for it to be sent to any other qualified firearms examiner. We have been asking for it. They said that they had done it a month ago, a month and a half ago.
 
 And Jerry Richardson, Mr. Richardson, has called and ... inquired and they still haven't sent them anywhere. All right. I am-I have-
 
 I'm wanting someone to look at them. That's fine with me.
 

 (Emphasis added.)
 

 In addition to evidence regarding the plan for the series of articles and the schedule for publication, plaintiff also presented evidence of internal email communications about the article between defendant Locke and other employees of defendant N & O. The emails tended to show defendants were more concerned with writing a highly critical and inflammatory article about the SBI and plaintiff than the accuracy of the article. For example, defendant Locke emailed the photographer working on the series team, Shawn Rocco, apologizing for the tight publication deadline. Rocco replied,
 

 hmmm, how to say this nicely.... shut up. We're all in this together.
 

 concentrate on writing the best damn piece you've ever done. I want you to compel our readers to gather pitchforks and torches.
 

 because shit like this has got to change.
 

 i'm infuriated that robin [Pendergraff] still keeps a job. t'aint nothing new in state gov, I know, but I'm pissed nonetheless.
 
 [5]
 

 Defendants argue their emails simply express their commitment to investigative journalism, the need to report to the public, and their responsibility to hold the SBI lab accountable for defective work in the
 
 *54
 
 investigation and prosecution of a murder. Viewed in the light most favorable to defendants, the emails could be interpreted as defendants contend. But we must view the emails in the
 
 *431
 
 light most favorable to plaintiff and resolve all conflicts in her favor,
 
 see
 

 Springs
 
 ,
 
 209 N.C. App. at 274-75
 
 ,
 
 704 S.E.2d at 323
 
 , and in this light, the internal emails, combined with the evidence of misrepresentations regarding the pictures of the bullet fragments to elicit certain opinions from the experts and the lack of information provided to those experts regarding the fact that no mistake had ever been identified, tended to show that the primary objective of defendants was sensationalism rather than truth.
 

 The evidence we have noted is just a brief sampling of some of the evidence supporting plaintiff's theory; the record on appeal is twelve volumes and the supplement to the record is over 8,500 pages. Overall, plaintiff presented evidence that defendants decided that they would publish an article, in August, revealing that plaintiff falsified evidence. In addition, defendants claimed the SBI had ignored questions about whether the bullet analysis was correct and sought to cover up any problems or investigation into any potential error. Defendant Locke's research for the series did not support the proposed premise but ultimately showed that none of the experts defendant Locke consulted would give any opinion based upon the photographs, and none of the experts had any personal knowledge of plaintiff's work and could give any opinion about it. Just before publication, defendant Locke knew that the independent analysis would be done by Bunch-but it would not be done in time for the article deadline-and if she waited for the analysis, it was possible that it may confirm that plaintiff's work was correct, thus eliminating the premise of the entire article. Instead of waiting for the independent analysis, defendants published the series, including the Six Statements, knowing that the experts consulted had actually not given any opinion of plaintiff's work and had told her repeatedly that they could not give any opinion based upon pictures.
 

 The law gives defendants much leeway in reporting about public figures in matters of public concern, requiring a showing of actual malice which is knowledge that the publication was false or a reckless disregard for the truth.
 
 Desmond I
 
 ,
 
 241 N.C. App. at 17
 
 ,
 
 772 S.E.2d at 135
 
 . Further protecting defendants from liability, the law allows for reasonable interpretations by reporters, even if the interpretation is wrong.
 
 See generally
 

 Ryan
 
 ,
 
 634 F.2d at 732-33
 
 . But there is a limit, and here plaintiff presented substantial and voluminous evidence that defendants exceeded that limit. The jury could have believed defendants' evidence and returned a verdict in their favor, but they considered plaintiff's evidence to be more
 
 *55
 
 convincing and credible. Where plaintiff has met the high standards of proof required in a defamation case regarding a public figure, this Court has no authority to second-guess the jury's credibility determinations or to weigh the evidence more favorably to defendants.
 

 "[U]pon examination of all the evidence in the light most favorable to ... [plaintiff], and ... [plaintiff] being given the benefit of every reasonable inference drawn therefrom and resolving all conflicts of any evidence in favor of ... [plaintiff],"
 
 Springs
 
 ,
 
 209 N.C. App. at 274-75
 
 ,
 
 704 S.E.2d at 323
 
 , there was "clear and convincing proof of 'actual malice[;]' "
 
 Harte-Hanks, Inc.
 
 ,
 
 491 U.S. at 686
 
 ,
 
 109 S.Ct. 2678
 
 ,
 
 105 L.Ed.2d at 588
 
 ,
 
 i.e.
 
 , evidence that defendants published the statements at issue "with knowledge that [they were] false or with reckless disregard of whether [they were] false or not."
 
 Desmond I
 
 ,
 
 241 N.C. App. at 17
 
 ,
 
 772 S.E.2d at 135
 
 . Upon our independent examination of the entire record, we have determined that "the evidence in the record ... is sufficient to support a finding of actual malice[.]"
 
 Harte-Hanks, Inc.
 
 ,
 
 491 U.S. 657
 
 , 685,
 
 109 S.Ct. 2678
 
 ,
 
 105 L.Ed.2d 562
 
 , 587. This argument is overruled.
 

 IV. Exclusion of Evidence
 

 Defendants next contend that the trial court erred in excluding a 7 December 2010 "INTERIM INSPECTION REPORT" from the American Society of Crime Laboratory Directors/Laboratory Accreditation Board ("ASCLD/LAB"). The report addressed the "limited scope interim inspection for the North Carolina State Bureau of Investigation (SBI) Crime Laboratory" conducted on October 26 through 28, 2010. The inspection was done "because ASCLD/LAB became aware of information suggesting serious
 
 *432
 
 negligence or misconduct substantially affecting the integrity of forensic result, or noncompliance with accreditation standards by an accredited laboratory." The report addressed "three separate forensic disciplines[:]" serology, controlled substances, and firearms. Serology and controlled substances are not relevant to this case, but the firearms section addresses the ASCLD/LAB investigation initiated based upon " State v. Green (2006)" and specifically references that "[a] News and Observer article published August 27, 2010 called into question the firearms work in this case."
 

 Plaintiff filed a motion in limine to exclude the report based on Rules of Evidence 401, 402, and 403. Plaintiff argued the report was irrelevant because it was published
 
 after
 
 the articles and failed to address plaintiff's work which was the subject of the statements. Plaintiff also argued the report should be excluded because the report "would unfairly prejudice ... [plaintiff] and would needlessly confuse and mislead the jury."
 

 *56
 
 The trial court agreed with plaintiff and stated in an order:
 

 The ASCLD-Lab report was prepared after the article in question and was not relied upon by Ms. Locke or any of the experts with whom she spoke. Moreover, as the report does not go to the accuracy of Ms. Desmond's conclusions, the Court finds that, at best, the proposed evidence is of very limited relevance and to the extent it has any probative value, that probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Therefore, the Court, in its discretion, will exclude said evidence.
 

 But defendants argue that the ASCLD report is relevant because the substance of the ASCLD report "contradict[ed plaintiff's] laboratory conclusions and report." In other words, defendants contend the report was relevant because it showed the truth of the articles' statements about plaintiff's work. Defendants contend that
 

 [p]ost-publication evidence is no less probative on the substantial truth question. The RESTATEMENT articulates the black-letter rule: "[I]f the defamatory matter is true, it is immaterial that the person who publishes it believes it to be false; it is enough that it
 
 turns out to be
 
 true." RESTATEMENT (2D) OF TORTS § 581A cmt. h, (emphasis added). Federal and state courts have applied that rule. Writing for the Seventh Circuit, for example, Judge Posner explained:
 

 [I]t makes no difference that the true facts were unknown until the trial. A person does not have a legally protected right to a reputation based on the concealment of the truth. This is implicit in the rule that truth-not just known truth ...-is a complete defense to defamation.
 

 In reviewing these evidentiary rulings under Rule 401, we give great deference to the trial court's determination, but our standard of review is more stringent than abuse of discretion:
 

 Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (2003).... Although the trial court's
 
 *57
 
 rulings on relevancy technically are not discretionary and therefore are not reviewed under the abuse of discretion standard applicable to Rule 403, such rulings are given great deference on appeal. Because the trial court is better situated to evaluate whether a particular piece of evidence tends to make the existence of a fact of consequence more or less probable, the appropriate standard of review for a trial court's ruling on relevancy pursuant to Rule 401 is not as deferential as the abuse of discretion standard which applies to rulings made pursuant to Rule 403.
 

 Dunn v. Custer
 
 ,
 
 162 N.C. App. 259
 
 , 266,
 
 591 S.E.2d 11
 
 , 17 (2004) (citations and quotation marks omitted). Furthermore,
 

 Under Rule 403, "although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C.G.S. § 8C-1, Rule 403 (2013).
 

 *433
 
 We review a trial court's decision to exclude evidence under Rule 403 for abuse of discretion. An abuse of discretion results when the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision. In our review, we consider not whether we might disagree with the trial court, but whether the trial court's actions are fairly supported by the record.
 

 State v. Triplett
 
 ,
 
 368 N.C. 172
 
 , 178,
 
 775 S.E.2d 805
 
 , 808-09 (2015) (citation and quotation marks omitted).
 

 Further, regarding the standard of review, defendants contend that the trial court's rulings excluding the report were not "run-of-the-mill evidentiary decisions[, but rather t]hey undermined The Newspaper Defendants' ability-guaranteed by the First Amendment-to offer evidence relevant to the substantial truth of the Six Statements." But even if we assume defendants properly raised and preserved a constitutional argument meriting
 
 de novo
 
 review, we still conclude defendants do not prevail on this issue.
 
 See generally
 

 Hart v. State
 
 ,
 
 368 N.C. 122
 
 , 130,
 
 774 S.E.2d 281
 
 , 287 (2015) ("[O]ur review of the constitutional questions presented is de novo.").
 

 *58
 
 Here, defendants mischaracterize the trial court's rationale in excluding the evidence. The trial court did not simply rule that because the report was published after the articles it was irrelevant for any purpose; it actually ruled that the report could not have been relevant to defendant Locke's state of mind when preparing the articles since it was not available then
 
 and
 
 it was not relevant to the truth of the matter because the report does not address plaintiff's work: "The ASCLD-Lab report was prepared after the article in question and
 
 was not relied upon by Ms. Locke
 
 or any of the experts with whom she spoke. Moreover, as the report
 
 does not go to the accuracy of Ms. Desmond's conclusions
 
 , the Court finds that, at best, the proposed evidence if of very limited relevance[.]"
 

 Defendants proffered the report as evidence, and we have read it; despite defendants' insistence that the report demonstrated the truth of the articles, that is simply not what the report does, as the trial court noted. For example, defendants argue that "[t]he Report was particularly relevant as to Statement One: 'Independent firearms experts who have studied the photographs question whether Desmond knows anything about the discipline. Worse, some suspect she falsified the evidence to offer prosecutors the answers they wanted.' " But the report mentions no "[i]ndependent firearms experts" who may have viewed the photographs, and there was no suggestion that plaintiff "falsified" evidence.
 

 The report did recommend that "[t]he laboratory should further investigate the testimony of the firearms analyst" "to ensure that the testimony is consistent with the examinations performed, training received and the examination documentation present."
 
 [6]
 
 Even under the most generous consideration, the report does not demonstrate the substantial truth of the six statements or the articles generally. The report does not address whether plaintiff's work was deficient-the issue raised in the articles-nor does it come to any conclusions regarding the bullets themselves. The most critical statement in the report is that plaintiff failed to include proper documentation of her work in the file, but the report does not address the accuracy of the actual work. We agree with the trial court that the report did not "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (2015).
 

 *59
 
 Furthermore, we agree with the trial court even if the report arguably has some relevance-perhaps that sloppy record-keeping may indicate sloppy work as well-"is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." The report was an
 
 interim
 
 report and recommended further investigation;
 

 *434
 
 that investigation was done. On 5 November, 2010, an independent firearms examiner, Bunch, examined the bullets and confirmed that plaintiff's analysis was accurate. The trial court's exclusion of the report was "the result of a reasoned decision."
 
 Triplett
 
 , 368 N.C. at 178,
 
 775 S.E.2d at 809
 
 .
 

 Defendants also argue that in proving the truth of their statements they offered the report, "among other things[.]" But defendants' brief does not identify any "other things" they offered to prove truth. Defendants have not demonstrated how the trial court "undermined" defendants' ability to present evidence of the truth of the statements by excluding the report. The report addresses laboratory practices and recommends further action, but made no conclusions about plaintiff's work which was the subject of the articles. Defendants have not noted any other evidence they sought to present regarding the truth of the statements which was excluded. Defendants were not impeded in the presentation of their defense of truth. We conclude the trial court did not err in excluding the evidence under Rule 401 or Rule 403 and did not prevent defendants from presenting evidence of truth of the statements. This argument is overruled.
 

 V. Jury Instructions
 

 Last, defendants challenge "errors and omissions in the jury instructions in both the liability and punitive damages phases" and argue that the improper jury instructions "deprived The Newspaper Defendants of First Amendment protections." (Original in all caps.) Defendants contest three portions of the jury instructions.
 

 A. Standard of Review
 

 A trial court's jury instructions are sufficient if they present the law of the case in such a manner as to leave no reasonable cause for believing that the jury was misled or misinformed. A charge must be construed contextually, and isolated portions of it will not be held prejudicial when the charge as a whole is correct. When a defendant requests an instruction which is supported by the evidence and is a correct statement of the law, the trial court must give the instruction, at least in substance.
 

 *60
 
 Arguments challenging the trial court's decisions regarding jury instructions are reviewed
 
 de novo
 
 by this Court. A trial court's failure to submit a requested instruction to the jury is harmless unless defendant can show he was prejudiced thereby.
 

 State v. Pendergraft
 
 ,
 
 238 N.C. App. 516
 
 , 532,
 
 767 S.E.2d 674
 
 , 685 (2014),
 
 aff'd per curiam
 
 ,
 
 368 N.C. 314
 
 ,
 
 776 S.E.2d 679
 
 (2015) (citations, quotation marks, and brackets omitted).
 

 B. Attribution
 

 Defendants contend "[t]he jury should have been instructed that falsity must be measured by the truth of the underlying statement, not the truth of the attribution." Defendants argue that their proposed instruction
 

 on material falsity that correctly focused on the truth of the underlying statement, not solely on the accuracy of the attribution to a particular source: "If you find that the underlying facts reported by a challenged Statement are substantially true, separate and apart from the attribution to a cited or quoted source or sources, you should find that Plaintiff has not carried her burden of proving material falsity." (R p 1824).
 

 The Superior Court refused to give that instruction. Instead, over The Newspaper Defendants' objection (R pp 1826-29; T pp 1866-82), the Court instructed the jury:
 

 The attribution of statements, opinions or beliefs to a person or persons may constitute libel if the attribution is materially false, or put another way, if it is not substantially true. The question is whether the statements, opinions or beliefs of the individuals that were reported as being held or expressed by the individuals were actually expressed by those individuals."
 

 In
 
 Desmond I
 
 , we addressed whether the statements regarding opinions of experts, viewed in the light most favorable to plaintiff for purposes of summary judgment,
 
 241 N.C. App. at 16
 
 ,
 
 772 S.E.2d at 134
 
 , could be
 
 *435
 
 defamatory, and we determined that they could:
 

 In this case, which involves mostly Locke's reports of opinions of experts regarding Desmond's work, fact and opinion are difficult to separate. Some of the allegedly
 
 *61
 
 defamatory statements, though stated as expressions of opinion from experts, may be factually false because Locke reported that the experts expressed opinions regarding Desmond's work that they actually did not express. In some instances, the evidence indicates that Locke asked the experts a hypothetical question, and they answered on the assumption that the facts of the hypothetical question were true, while the facts were actually false and Locke either knew the facts were false or she asked the question with reckless disregard for the actual facts. The experts' opinions were then stated in the article as opinions which the experts gave about Desmond's actual work, instead of in response to a hypothetical question. Thus, the statements, even as opinions, "imply a false assertion of fact" and may be actionable under
 
 Milkovich
 
 .
 
 See
 

 id.
 
 at 19, 111 L.Ed.2d at 18.
 

 Id.
 
 at 21,
 
 772 S.E.2d at 137
 
 . The description of the evidence in
 
 Desmond I
 
 was based upon the forecast of evidence for summary judgment, but the evidence presented at trial, some of which is noted in this opinion, was consistent with the description in
 
 Desmond I
 
 .
 
 See generally
 
 id.
 

 Defendants argue that the attribution of the statements to experts is not "the 'sting' " of the defamatory meaning and contend that only the underlying statement can be libelous, so the jury should have considered the evidence only as to the truth or falsity of the underlying assertion of fact, not the truth or falsity of the attribution. Certainly, the truth or falsity of the underlying statements is important, but in this case, all of the evidence tends to show that the statements are in fact false. Independent analysis of the bullets ultimately confirmed plaintiff's conclusions. Thus, defendants focus on whether the evidence shows that they intentionally misrepresented the opinions of the various experts.
 

 Reporters use quotes from a source to "add authority to the statement and credibility to the author's work. Quotations allow the reader to form his or her own conclusions and to assess the conclusions of the author, instead of relying entirely upon the author's characterization of her subject."
 
 Masson v. New Yorker Magazine, Inc.
 
 ,
 
 501 U.S. 496
 
 , 511,
 
 111 S.Ct. 2419
 
 ,
 
 115 L.Ed.2d 447
 
 , 469 (1991). The United States Supreme Court explained how quotations, or attribution to a source, can be defamatory:
 

 A fabricated quotation may injure reputation in at least two senses, either giving rise to a conceivable claim of defamation. First, the quotation might injure because it
 
 *62
 
 attributes an untrue factual assertion to the speaker. An example would be a fabricated quotation of a public official admitting he had been convicted of a serious crime when in fact he had not.
 

 Second, regardless of the truth or falsity of the factual matters asserted within the quoted statement, the attribution may result in injury to reputation because the manner of expression or even the fact that the statement was made indicates a negative personal trait or an attitude the speaker does not hold.
 

 Id.
 

 [7]
 

 Here, some of the statements are quotations, while others are attributed generally to "[i]ndependent firearms experts" or "analysts[.]" Plaintiff claims defendant Locke intentionally misrepresented what the experts had said about her work. The Supreme Court has held that "a deliberate alteration of the words uttered" may be defamatory if it materially changes the meaning of the statement:
 

 Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified. Put another way, the statement is not considered false unless it would have a different effect on the mind of the reader from
 
 *436
 
 that which the pleaded truth would have produced. Our definition of actual malice relies upon this historical understanding.
 

 We conclude that a deliberate alteration of the words uttered by a plaintiff does not equate with knowledge of falsity for purposes of
 
 New York Times Co. v. Sullivan
 
 ,
 
 376 U.S. at 279-280
 
 ,
 
 84 S.Ct. at
 
 725-726 and
 
 Gertz v. Robert Welch, Inc.
 
 ,
 
 supra
 
 ,
 
 418 U.S. at 342
 
 ,
 
 94 S.Ct. at 3008
 
 , unless the alteration results in a material change in the meaning conveyed by the statement. The use of quotations to attribute words not in fact spoken bears in a most important way on that inquiry, but it is not dispositive in every case.
 

 Id.
 

 at 517
 
 ,
 
 115 L.Ed. 2d at 470, 472-73
 
 (citations and quotation marks).
 

 *63
 
 Furthermore, defendants' entire purpose in seeking review of plaintiff's work by experts was to provide an authoritative, and therefore damaging, criticism of plaintiff's work. Firearms analysis is a specialized technical field and most people do have adequate knowledge of this type of work to understand plaintiff's work or to determine if her work was defective; the very reason defendants consulted experts as part of the research for the articles was to give the articles credibility. If defendant Locke had asked a person with no expertise or status in the field of firearms analysis to give an opinion about plaintiff's work, that person's opinion would not be meaningful or useful to the readers of the article, and it may not even be defamatory to plaintiff simply because of the lack of expertise and knowledge of the person giving the opinion. For example, if we substitute random people with no knowledge or expertise in firearm analysis into the statements in place of the references to experts, it is obvious that without the attribution to experts in the field, the statements would have little or no meaning. The statements are close to nonsense if they are attributed to people with no expertise:
 

 (1) "[Several people at Starbucks] who have studied the photographs question whether Desmond knows anything about the discipline. Worse, some suspect she falsified the evidence to offer prosecutors the answers they wanted."
 

 (2) " 'This is a big red flag for the whole unit,' said ... [another man on the street]. 'This is as bad as it can be. It raises the question of whether she did an analysis at all.' "
 

 (3) "[Several people who live in Virginia] say the widths of the lands and the grooves on the two bullets are starkly different, which would make it impossible to have the same number."
 

 (4) " 'You don't even need to measure to see this doesn't add up,' said [another random person who saw the photos]. 'It's so basic to our work. The only benefit I can extend is that she accidentally measured the same bullet twice.' "
 

 (5) "[Some other people at the grocery store] say that even with the poor photo lighting and deformed bullets, it's obvious that the width of the lands and grooves are different."
 

 (6) "[Some other people] who viewed the photographs, including ... [an accountant], said the bullets could not have been fired from the same firearm.
 

 Without attribution to experts in the relevant field, the statements have "a different effect on the mind of the reader."
 

 *64
 

 Id.
 

 at 517
 
 ,
 
 115 L.Ed.2d at 470, 472
 
 . Reporters seek experts to provide analysis and opinions on topics beyond the knowledge of those untrained in the discipline addressed in an article precisely
 
 because
 
 only an expert's opinion will be meaningful. Without information from the experts to explain firearms analysis, the meaning and significance of "lands and the grooves[,]" the proper methods of testing, the photographs of the bullet fragments would be meaningless to the average reader of the articles. Therefore, the trial court correctly instructed the jury regarding attribution of the statements. This argument is overruled.
 

 C. Standard of Proof of Material Falsity
 

 Defendants next contend "[t]he jury should have been instructed that a public-official defamation plaintiff must prove material falsity by clear and convincing evidence" rather than the preponderance of the evidence standard the trial court used. The jury answered
 
 *437
 
 two sub-issues as to each statement: (1) whether by the greater weight of the evidence" the statement "was materially false" and (2) whether, "by strong, clear and convincing evidence" the statement was made with actual malice.
 

 The United States Supreme Court has not required that material falsity be shown by clear and convincing evidence: "There is some debate as to whether the element of falsity must be established by clear and convincing evidence or by a preponderance of the evidence. We express no view on this issue."
 
 Harte-Hanks
 
 ,
 
 491 U.S. at
 
 661 n.2,
 
 109 S.Ct. 2678
 
 ,
 
 105 L.Ed.2d 562
 
 , 572 n.2 (citations omitted). Plaintiff notes,
 

 It should be emphasized that most jurisdictions have not directly addressed the issue (arguably because they do not see any reason to change existing law), so in those jurisdictions, the longstanding law of instructing as to preponderance of the evidence on the issue of falsity remains. North Carolina falls into this category. Regardless, it certainly is not error for the trial court to have used the pattern jury instruction that is an appropriate and accurate statement of the law.
 

 North Carolina has never adopted a standard of "clear and convincing evidence" and thus we do not conclude "the jury was misled or misinformed" when it did not receive that instruction.
 
 Pendergraft
 
 ,
 
 238 N.C. App. at 532
 
 ,
 
 767 S.E.2d at 685
 
 . This argument is overruled.
 

 D. Punitive Damages
 

 Last, defendants contend the trial court erred in the jury instructions on punitive damages because the instructions did not require the
 
 *65
 
 "jurors to find the existence of one of the required statutory aggravating factors." Defendants argue that the jury should have been instructed that it must find at least one of the three aggravating factors required by North Carolina General Statute § 1D-15.
 

 North Carolina General Statute § 1D-15 provides:
 

 (a) Punitive damages may be awarded only if the claimant proves that the defendant is liable for compensatory damages and that one of the following aggravating factors was present and was related to the injury for which compensatory damages were awarded:
 

 (1) Fraud.
 

 (2) Malice.
 

 (3) Willful or wanton conduct.
 

 N.C. Gen. Stat. § 1D-15(a) (2015). Under North Carolina General Statute § 1D-15(b), "[t]he claimant" also "must prove the existence of an aggravating factor by clear and convincing evidence[;]" this is the same standard for proof of actual malice in the liability phase of the trial. N.C. Gen. Stat. § 1D-15(b) (2015) ;
 
 see generally
 

 Harte-Hanks
 
 ,
 
 491 U.S. at 686
 
 ,
 
 109 S.Ct. 2678
 
 ,
 
 105 L.Ed.2d at 588
 
 .
 

 Chapter 1D of the General Statutes also specifically defines "[m]alice" and "[w]illful or wanton conduct" for purposes of punitive damages:
 

 (5) "Malice" means a sense of personal ill will toward the claimant that activated or incited the defendant to perform the act or undertake the conduct that resulted in harm to the claimant.
 

 ....
 

 (7) "Willful or wanton conduct" means the conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm. "Willful or wanton conduct" means more than gross negligence.
 

 N.C. Gen. Stat. § 1D-5 (2015).
 

 On appeal, defendants attempt to distinguish the "malice" and "willful or wanton" behavior as required by North Carolina General Statute § 1D-5 from the standards required in the liability phase of the trial, which included that the jury must find that defendants "either knew the statement[s were] materially false or acted with reckless disregard of
 
 *66
 
 whether the statement[s were] materially false." But on this issue, the trial court instructed in accord with the pattern jury instructions.
 

 Both parties submitted numerous written requests for jury instructions in the liability and punitive damages phases of the trial. The trial court used portions of the special instructions requested by defendants, such as the instructions regarding rational interpretation,
 
 *438
 
 but the instructions primarily followed the North Carolina Pattern Jury Instructions, "the preferred method of jury instruction[.]"
 
 See
 

 In re Will of Leonard
 
 ,
 
 71 N.C. App. 714
 
 , 717,
 
 323 S.E.2d 377
 
 , 379 (1984) ("[T]he trial court undertook to set out the two issues pursuant to our Pattern Jury Instructions, N.C.P.I.-Civil, 860.00, 860.25 (1975). We have previously observed that the preferred method of jury instruction is the use of the approved guidelines of the North Carolina Pattern Jury Instructions."). The pattern jury instructions include an extensive discussion of the variants of instructions needed in different types of defamation cases-per se or per quod-and different types of plaintiffs-private figure or public figure or official.
 
 [8]
 

 See generally
 
 N.C.P.I.-Civil 806.40-806.85. The pattern instructions as used by the trial court were written in 2008,
 
 see generally
 

 id.
 

 , and thus were written after the definitions of "[m]alice" and "[w]illful or wanton conduct" were added in North Carolina General Statute § 1D-5 in 1995.
 
 See generally
 
 N.C. Gen. Stat. § 1D-5 (2015) History.
 

 Yet, despite these statutory definitions, the pattern instructions direct that a finding of actual malice in the liability phase of a defamation trial regarding a public official or figure is sufficient to support an award for punitive damages.
 
 [9]
 
 N.C.P.I.-Civil 806.40 ("[O]nce a public figure plaintiff proves liability under the actual malice standard, that plaintiff will be able to seek presumed and punitive damages without proving an additional damages fault standard[.]"). Thus, under
 
 *67
 
 North Carolina's current law, punitive damages would be supported by the jury's determination during the liability phase. When we consider the instructions as a whole, we are satisfied that the jury was not misled and considered punitive damages under the correct standards. As part of the instructions in the liability phase of the trial, the jury had to determine, "by clear, strong, and convincing evidence that" defendants "either knew the statement was materially false or acted with reckless disregard of whether the statement was materially false. Reckless disregard means that, at the time of the publication, the Defendants had serious doubts as to whether the statement was true."
 

 Even if the instructions on punitive damages could have been worded differently, the instructions as a whole set forth the law correctly. Defendants have not shown that the jury was misinformed or misled by the instructions as given.
 
 See
 

 Floyd v. McGill
 
 ,
 
 156 N.C. App. 29
 
 , 40-41,
 
 575 S.E.2d 789
 
 , 797 (2003) ("On appeal, this Court considers a jury charge contextually and in its entirety. The charge will be held to be sufficient if "it presents the law of the case in such manner as to leave no reasonable cause to believe the jury was misled or misinformed. The party asserting error bears the burden of showing that the jury was misled or that the verdict was affected by an omitted instruction. Under such a standard of review, it is not enough for the appealing party to show that error occurred in the jury instructions; rather, it must be demonstrated that such error was likely, in light of the entire charge, to mislead the jury." (citation, quotation marks, and ellipses omitted) ). We hold that the trial court properly instructed the jury on punitive damages under North Carolina General Statute § 1D-15.
 

 VI. Conclusion
 

 We conclude that plaintiff submitted clear and convincing evidence of actual malice, and the trial court properly denied defendant's
 
 *439
 
 motion for judgment notwithstanding the verdict. The trial court did not abuse its discretion by excluding defendants' proffered report. The jury instructions, as a whole, properly instructed the jury such that it was correctly informed of the law and not misled.
 

 AFFIRMED.
 

 Judges ZACHARY and MURPHY concur.
 

 [1]
 

 McClatchy Newspapers, Inc. is not a party to this appeal, and thus "defendants" refers only to defendants N & O and Locke.
 

 [2]
 

 Defendants' notice of appeal also appeals from "[t]he 'Judicial Review of Punitive Damages Award and Order Reducing Amount of Punitive Damages' " and other "rulings and orders[,]" but substantively on appeal defendants' arguments concern the order and judgment entered upon the jury verdict and the order denying defendants' JNOV.
 

 [3]
 

 Pursuant to North Carolina General Statute § 1D-50, the trial court reduced the punitive damages award against defendant N & O to approximately $4.5 million.
 

 [4]
 

 Title as noted by Mr. Richardson on the signature line of his email.
 

 [5]
 

 Robin Pendergraft was Director of the SBI.
 

 [6]
 

 Another report was done by ASCLD/LAB in August of 2011 and concluded the issues raised were resolved.
 

 [7]
 

 Though in
 
 Masson
 
 analysis focused on "whether the requisite falsity inheres in the attribution of words to the petitioner which he did not speak[,]" the same analysis would apply to attributions to a third-party source, as in this case.
 
 501 U.S. 496
 
 , 513,
 
 111 S.Ct. 2419
 
 ,
 
 115 L.Ed.2d 447
 
 , 470 (1991).
 

 [8]
 

 "Under current U.S. Supreme Court jurisprudence, however, in the case of a public figure or public official, the element of publication with actual malice must be proven, not only to establish liability, but also to recover presumed and punitive damages. Thus, in a defamation case actionable
 
 per se
 
 , once a public figure plaintiff proves liability under the actual malice standard, that plaintiff will be able to seek presumed and punitive damages without proving an additional damages fault standard and, if proof of actual damage in the form of pecuniary damages or actual harm damages is presented, may seek such damages as well." N.C.P.I.-Civil 806.40 (footnote omitted). "The trial judge must, as a matter of law, determine the classification of a particular defamation claim for both common law and constitutional purposes. Once such classification has been determined, differing fault levels for both liability and damages apply."
 

 Id.
 

 (footnote omitted).
 

 [9]
 

 In contrast, "Notwithstanding, with regard to punitive damages, a private figure/private matter plaintiff seeking such damages currently must also satisfy the following statutory provisions: N.C. Gen. Stat. § 1D-15." N.C.P.I.-Civil 806.40.